IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

MISTY ELIZABETH WHITE,
as Ancillary Administrator of the
Estate of ROBERT EMERY WHITE, JR.,
Deceased                                                                        PLAINTIFF


v.                                        Case No. 6:20-cv-6089


CORPORAL ABDEL K. KARIMOU,
Individually and in his Capacity as a
Correctional Officer for the Arkansas
Department of Corrections, et al.                                               DEFENDANTS

### MEMORANDUM OPINION

Before the Court is Defendants' Motion for Summary Judgment.  (ECF No. 37).  Plaintiff

responded.  (ECF No. 44).  Defendants have not replied and their time to do so has passed.  *See*

Local Rule 7.2(b).  The matter is ripe for consideration.  For the following reasons, the motion will

be granted.

### I.  BACKGROUND

Robert Emery White, Jr. was incarcerated in the Ouachita River Unit of the Arkansas

Department of Corrections ("ADC").  On March 10, 2019, at 8:52 p.m., Mr. White entered his cell

and put a blanket over the doorway, blocking the view inside.  At approximately 9:20 p.m., another

inmate, Kendall Rudley, went into Mr. White's cell to advise him to take the blanket down.  He

found Mr. White unresponsive, hanging from a makeshift noose tied to the frame of the cell's top

bunk.  Thinking Mr. White was dead or unconscious, Mr. Rudley yelled for help and another

inmate, Mark McDaniel, came into the cell and untied the noose's knot from the top bunk.  Mr.

McDaniel lowered Mr. White to the ground, with the noose still wrapped around his neck.  Mr.

McDaniel observed Mr. White as unresponsive, purple, cold, and drooling at the mouth.  The two inmates stepped outside the cell and yelled for help.

Defendants Abdel Karimou and Jesus Feliberty-Casiano were performing security checks with another guard when they heard inmates making a commotion in Barracks 3, where Mr. White's cell was located.  As they entered the Barracks 3 common area, inmates told them that an inmate "was trying to hang himself" and "was dead."  (ECF No. 37-5, p. 4).[1]  The guards went to Mr. White's cell and Defendant Feliberty-Casiano immediately radioed for a supervisor to come to the scene.

The guards found Mr. White unresponsive, pale, blue, drooling, and not showing signs of life, like breathing or movement.  Defendant Karimou stepped into the cell while the other two guards remained at the cell door to keep watch and secure the area.  Defendant Karimou shouted at Mr. White but received no response.  The parties dispute whether Defendant Karimou physically touched or checked Mr. White's body for a pulse.[2]  Regardless, Defendant Karimou believed that Mr. White was dead and told the other guards as much.   The guards did not attempt cardiopulmonary resuscitation ("CPR") at that time.

The guards' supervisor, Defendant Bobby Cohen, arrived at the scene and observed Mr. White slumped down on the floor, with dark gray or blue skin.  The guards informed Defendant Cohen that Mr. White had hanged himself.  Defendant Cohen asked whether they called for

---

[1] Unless otherwise noted, all citations to specific pages in record filings are to the pagination generated at the top of the page by the CM/ECF system.

[2] Defendant Karimou testified at his deposition that he tapped Mr. White's shoulder to try to rouse him and subsequently checked Mr. White's jugular for a pulse and found none.  (ECF Nos. 37-1, pp. 127, 129, 134). Meanwhile, inmate Jacob Townsend provided a written witness statement on March 10, 2019, indicating that neither Defendant Karimou nor the other guards ever touched Mr. White's body before medical assistance arrived.  (ECF No. 44-5).  At this stage, the Court must resolve all genuine fact disputes and make all reasonable inferences in Plaintiff's favor.  *See Jones v. McNeese*, 675 F.3d 1158, 1161-62 (8th Cir. 2012).  The Court will proceed under the assumption that Defendant Karimou did not physically touch Mr. White or check his pulse.

medical staff, they responded that they had not, and he immediately radioed for medical staff. Defendant Cohen did not enter the cell, touch Mr. White, or attempt CPR because he believed Mr. White was already dead and he wanted to preserve the area for a subsequent state police investigation.[3]  While waiting for medical staff to arrive, Defendant Cohen and the guards stayed outside the cell and attempted to disburse the gathered crowd of inmates and secure the area.  The summary judgment record is unclear, but it seems that Defendants Christopher Cook, Dustin Phillips, and Richard Salceda—all ADC guards—arrived on the scene at some point afterwards, and it does not appear that they touched Mr. White or attempted CPR.

At roughly 9:31 p.m., Nurse Melanie Thomas arrived at Mr. White's cell in response to Defendant Cohen's call for medical assistance.  She found Mr. White unresponsive, with a very white skin color.  She removed the noose from around his neck, checked his carotid artery for a pulse, and found none.  His skin was cool to the touch.  He did not show signs of life, like breathing or movement.  She began performing CPR and requested that the guards call emergency medical services.  Medics eventually arrived and took over Mr. White's medical care.  Defendant Cohen helped perform CPR to give the medics a break when needed.

Mr. White was pronounced dead at 9:53 p.m.  Dr. Charles Kokes, the chief medical examiner for the Arkansas Crime Lab, examined Mr. White's body and determined the cause of death was hanging and the manner of death was suicide.  The Arkansas State Police investigated and found no reason to believe that Mr. White's death was anything other than a suicide.

On August 21, 2020, Plaintiff Misty White, the ancillary administrator of Mr. White's estate, filed this civil-rights case pursuant to 42 U.S.C. § 1983 and the Arkansas Civil Rights Act

---

[3] Of the guards present at this time, only Defendants Cohen and Feliberty-Casiano were trained and actively certified to perform CPR.  Defendant Karimou was previously CPR certified, but his certification expired at least three years before the events at issue and had not been renewed.  (ECF No. 37-1, p. 61).

("ACRA"), Ark. Code Ann. § 16-123-105 et seq.  Plaintiff alleges that Defendants violated Mr. White's rights under the United States and Arkansas Constitutions to be free from cruel and unusual punishment.   Specifically, she alleges that Defendants Karimou, Feliberty-Casiano, Cohen, Cook, Phillips, and Salceda were deliberately indifferent to Mr. White's serious medical needs by making no attempt to provide CPR or other resuscitative efforts to Mr. White for over seven minutes until medical personnel arrived, which ultimately caused his death.  She also alleges that Defendant Michael Elmore, the captain at the Ouachita River Unit, is liable for failing to adequately train the other Defendants, resulting in the constitutional deprivation.

On March 2, 2022, Defendants filed the instant motion for summary judgment.  Plaintiff opposes the motion.

## II.  STANDARD

The standard for summary judgment is well established.   A party may seek summary judgment on a claim, a defense, or "part of [a] claim or defense."  Fed. R. Civ. P. 56(a).  When a party moves for summary judgment, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Krenik v. Cnty. of LeSueur*, 47 F.3d 953, 957 (8th Cir. 1995).  This is a "threshold inquiry of . . . whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A fact is material only when its resolution affects the outcome of the case.  *Id.* at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id.* at 252.

In deciding a motion for summary judgment, the Court must consider all the evidence and

all reasonable inferences that arise from the evidence in a light most favorable to the nonmoving party. *Nitsche v. CEO of Osage Valley Elec. Co-Op*, 446 F.3d 841, 845 (8th Cir. 2006). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. However, a party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Qualified immunity "is an immunity from suit rather than a mere defense to liability[;] . . . it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). At the summary judgment stage, "qualified immunity cases are somewhat unique in that the court should [not] deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity." *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (alterations in original). Instead, the Court "must take a careful look at the record, determine which facts are genuinely disputed, and then view those facts in a light most favorable to the non-moving party as long as those facts are not so blatantly contradicted by the record . . . that no reasonable jury could believe [them]." *Id.* at 1161-62 (alteration in original) (internal quotation marks omitted).

### III. DISCUSSION

Defendants contend that they are entitled to sovereign immunity on the claims against them in their official capacities. They also contend that they are entitled to qualified immunity on the claims against them in their individual capacities. The Court will address these arguments in turn.

### A. Sovereign Immunity

Plaintiff sued Defendants in both their individual and official capacities. Defendants argue that they are entitled to sovereign immunity on Plaintiff's official-capacity claims because they are employees of the ADC, an agency of the State of Arkansas.

Plaintiff did not respond to Defendants' arguments on the official-capacity claims. Thus, the Court assumes she has abandoned and waived her official-capacity claims. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."); *Chipman v. Cook*, No. 3:15-cv-143-KGB, 2017 WL 1160585, at *7 (E.D. Ark. Mar. 28, 2017) (finding that failure to address a summary judgment argument on a claim is a waiver of that claim); *see also Allen v. Missouri*, No. 4:11-cv-2224-JAR, 2013 WL 2156259, at *12 (E.D. Mo. May 17, 2013) (construing the plaintiff's failure to respond to a summary judgment motion regarding certain claims as the plaintiff's abandonment of those claims). Though, assuming *arguendo* that Plaintiff has not abandoned her official-capacity claims, they are barred by sovereign immunity.

The Eleventh Amendment generally bars lawsuits for money damages in federal court against a state, a state agency, or a state official sued in his or her official capacity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). There are certain exceptions to Eleventh Amendment sovereign immunity. *Burk v. Beene*, 948 F.2d 489, 493 (8th Cir. 1991). "A state may waive its sovereign immunity and consent to suit in federal court, and Congress may, by legislation, abrogate immunity without the state's consent in order to effectuate the provisions of the Fourteenth Amendment." *Id.* However, "Congress did not abrogate constitutional sovereign immunity when enacting . . . section 1983." *Id.*

Plaintiff's official-capacity claims against Defendants are essentially claims against their employing governmental entity, the State of Arkansas. *See Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010); *Murray v. Lene*, 595 F.3d 868, 873 (8th Cir. 2010).   The State of Arkansas is not a "person" subject to suit for money damages under section 1983. *See Will*, 491 U.S. at 64, 70.

Plaintiff has not shown that the State of Arkansas or its agencies waived sovereign immunity or otherwise consented to this suit, and Congress did not abrogate the states' sovereign immunity when it enacted section 1983.   Plaintiff requests monetary damages, so her official-capacity claims are barred by the doctrine of sovereign immunity. *See Murphy v. State of Ark.*, 127 F.3d 750, 754 (8th Cir. 1997) (awarding sovereign immunity in dismissing official-capacity claims for money damages against state employees in a section 1983 case).

Defendants are entitled to sovereign immunity on Plaintiff's official-capacity claims. Those claims will be dismissed with prejudice.

**B. Qualified Immunity**

Defendants argue that they are entitled to qualified immunity on Plaintiff's individual-capacity claims because the evidence shows they did not violate Mr. White's constitutional rights and, even assuming that they did, the implicated rights were not clearly established at the time.

A federal cause of action exists for the deprivation, under color of state law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.   42 U.S.C. § 1983.   However, the affirmative defense of qualified immunity shields government officials from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Whether a defendant is entitled to qualified immunity is ordinarily a question of law to be

decided by the trial court.  *J.H.H. v. O'Hara*, 878 F.2d 240, 243 (8th Cir. 1989), *cert. denied*, 493 U.S. 1072 (1990).

Qualified immunity requires a two-pronged inquiry.  *Jones*, 675 F.3d at 1161.  The Court must determine whether the facts demonstrate a deprivation of a constitutional right.  *Id.* (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)).  The Court must also decide whether the implicated right was clearly established at the time of the deprivation.  *Id.*  The Court may begin with either prong and may conclude the analysis if either is not met.  *Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017).  The Court will begin with whether Defendants committed a constitutional deprivation and, if that question is answered affirmatively, then the Court will decide whether the implicated right was clearly established at the time.

### 1. Constitutional Deprivation

Plaintiff contends that Defendants were deliberately indifferent to Mr. White's serious medical needs, in violation of the Eighth Amendment.  Defendants disagree.

The Court must determine whether the record establishes that Defendants deprived Mr. White of a constitutional right.  *Jones*, 675 F.3d at 1161.  The Eighth Amendment's prohibition of cruel and unusual punishment forbids deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).  Thus, to prevail on her Eighth Amendment claims, Plaintiff must prove that Defendants acted with deliberate indifference to Mr. White's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

The deliberate-indifference standard includes "both an objective and a subjective component: '[Plaintiff] must demonstrate (1) that [Mr. White] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (alterations in original).  To show

that Mr. White suffered from an objectively serious medical need, Plaintiff must show he was "diagnosed by a physician as requiring treatment" or had an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011).

To satisfy the subjective prong of deliberate indifference, "it is not enough that a reasonable official should have known of the risk." *Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000). Rather, Plaintiff must show that Defendants knew of the risk and deliberately disregarded it. *Id.* "This knowledge is subject to proof by all the usual ways, including inferences based on the obviousness of the risk." *Id.* However, "even if an official knows of a risk, he is not liable for a subsequent injury if he responded reasonably to the known risk." *Id.* When evaluating whether Defendants unreasonably disregarded a risk to Mr. White, the Court considers their "actions in light of the information . . . possessed at the time, the practical limitations of [their] position and alternative courses of action that would have been apparent to an official in that position." *Id.* at 419.

Plaintiff "must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citation omitted). Deliberate indifference may be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). The objective seriousness of delay in treatment must be measured by reference to the effect of delay, which must be shown by verifying medical evidence in the record. *Laughlin v. Schriro*, 430 F.3d 927, 929

(8th Cir. 2005).  *But see Schaub*, 638 F.3d at 919 (stating that submission of verifying medical evidence is unnecessary where the need for medical attention would have been obvious to a layperson).

With that framework in mind, the Court will first address Plaintiff's claim against Defendant Elmore.  Then the Court will address Plaintiff's claim against the other Defendants.

### a. Defendant Elmore

Plaintiff alleges that Defendant Elmore, the captain at the Ouachita River Unit, was deliberately indifferent because he failed to adequately train the other Defendants to respond to medical emergencies, causing their deprivation of Mr. White's Eighth Amendment rights. Defendants argue that there is no evidence showing that Defendant Elmore had direct involvement with the events involving Mr. White's death on March 10, 2019, or that he was aware of any information that could have been acted on to avoid Mr. White's death.  Plaintiff does not respond to these arguments, which by itself is enough to grant summary judgment to Defendant Elmore. *See Satcher*, 558 F.3d at 735 ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").  However, Plaintiff's claim also fails on the merits.

A supervisor may not be held liable under section 1983 for the constitutional violations of a subordinate on a *respondeat superior* theory.  *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). Rather, a supervisor's liability only arises if:

> [H]e directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights.  The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts.  This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

*Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996) (internal citations omitted).

Nothing in this case indicates that Defendant Elmore directly participated in the events at issue on March 10, 2019. Instead, Plaintiff alleges that he inadequately trained the other Defendants to appropriately respond to Mr. White's emergency. But Plaintiff offers no summary judgment argument on this issue and provides no evidence that would have alerted Defendant Elmore that the other Defendants were inadequately trained to respond to medical emergencies or that the inadequate training would likely cause a constitutional deprivation.

Based on the record, no reasonable jury could conclude that Defendant Elmore violated Mr. White's constitutional rights by failing to properly train the other Defendants. *See Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (noting the absence of evidence on a supervisory defendant's alleged failure to train and holding the same); *see also Davis v. Fulton Cnty.*, 90 F.3d 1346, 1350 (8th Cir. 1996) ("The non-moving party . . . may not rest upon mere . . . allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial."). Defendant Elmore is entitled to qualified immunity. *See Jones*, 675 F.3d at 1161. The individual-capacity claim against him will be dismissed with prejudice.

### b. Other Defendants

Plaintiff argues the other Defendants were deliberately indifferent because they failed to attempt CPR on Mr. White for over seven minutes until Nurse Thomas arrived at the scene. "An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference." *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009). The Court first addresses whether Defendants were trained to perform CPR.

It seems undisputed that Defendant Cohen was CPR certified—he testified at his deposition that all sergeants with the ADC must be CPR certified and, although he could not recall when, he would have become CPR certified when he became a sergeant. Based on that testimony, and

lacking any contrary record evidence, it can reasonably be inferred that Defendants Phillips and Cook, who were also sergeants at the ADC, were likewise CPR certified.  *See Nitsche*, 446 F.3d at 845.  Defendant Feliberty-Casiano was CPR certified, despite not being a sergeant.[4]

Defendant Karimou was once CPR certified for a previous job, but his certification expired at least three years before the events at issue and had not been renewed.  (ECF No. 37-1, p. 61). Defendants appear to argue that because his certification was not active, he was not trained to administer CPR for purposes of the deliberate indifference analysis.  Plaintiff appears to suggest the opposite, that his prior training made him capable of performing CPR.  The Court resolves the dispute in Plaintiff's favor and assumes that, even though Defendant Karimou's CPR certification was expired, he could have performed CPR on March 10, 2019.

The parties' briefs and statements of fact do not mention Defendant Salceda at all.  There is no record evidence that he was CPR certified on March 10, 2019.  He was only a corporal with the ADC, so the record does not allow the reasonable inference that he was certified in CPR.  In the absence of any evidence showing Defendant Salceda was trained to perform CPR, no reasonable jury could find him deliberately indifferent for not providing CPR to Mr. White.  *See McRaven*, 577 F.3d at 983 (providing for deliberate indifference when an officer who is trained in CPR refuses to perform it on a prisoner manifestly in need of it).  Accordingly, Defendant Salceda is entitled to qualified immunity.  The deliberate indifference claim against him will be dismissed with prejudice.

It is undisputed that when the CPR-certified Defendants arrived at Mr. White's cell, they were told he tried to hang himself and was dead.  They found Mr. White unresponsive, not

---

[4] Defendants' brief asserts that Defendant Feliberty-Casiano was not CPR trained.  (ECF No. 39, pp. 10-11).  However, Defendants point to no record evidence supporting this assertion and Plaintiff provides other evidence showing that he was, in fact, actively certified.  (ECF No. 44-1).  At best, this presents a dispute of fact that the Court resolves in Plaintiff's favor.

breathing or moving in any way, and exhibiting an unnatural skin color.  It is likewise undisputed that Defendants all subjectively believed Mr. White was dead.  Nurse Thomas testified that after she arrived on the scene, her medical standard of care would not allow her to assume Mr. White was dead, but a layperson would have thought Mr. White was dead after observing him.  It is undisputed that Defendants were not trained medical personnel.

The question becomes whether Defendants Karimou, Feliberty-Casiano, Cohen, Phillips, and Cook—all laypeople who were trained in CPR—were deliberately indifferent by failing to check Mr. White's pulse and perform CPR when they believed he had hanged himself and was dead, observed that he was not breathing or moving, and did not know how long he had been in such a state.  The parties mainly discuss two Eighth Circuit opinions on this issue:  *McRaven v. Sanders*, 577 F.3d 974 (8th Cir. 2009), and *Tlamka v. Serrell*, 244 F.3d 628 (8th Cir. 2001).  Plaintiff contends that under the two cases, Defendants were deliberately indifferent.  Defendants contend that those cases are factually distinguishable from this case and do not support a finding of deliberate indifference here.

In *Tlamka*, corrections officers ordered inmates to stop performing CPR on a fellow inmate who had a heart attack in the prison yard, despite the CPR noticeably improving the inmate's condition.  *Tlamka*, 244 F.3d at 630-31.  The inmate's condition immediately deteriorated after CPR ceased and the guards, all trained in CPR, made no effort to resume CPR until a prison nurse arrived up to ten minutes later.  *Id.* at 631.  The nurse's subsequent medical efforts were unsuccessful, and the inmate died.  *Id.*  On appeal, the Eighth Circuit reversed the lower court's grant of qualified immunity, holding that in the absence of any explanation, a reasonable jury could find the guards deliberately indifferent for refusing to resume CPR.  *Id.* at 633-35.

*McRaven* featured a pretrial detainee who had been arrested for driving under the influence. *McRaven*, 577 F.3d at 978.  Officers collected a urine sample from the detainee, which tested positive for the presence of several drugs.  *Id.*  The officers consulted a nurse at the facility regarding whether the detainee should be sent to the hospital, but did not tell the nurse about the drug test results.  *Id.*  The nurse, believing the detainee was simply drunk, declined to send the detainee to the hospital.  *Id.* at 979.  The detainee was placed in a cell to sleep off the effects.  *Id.* A cellmate later informed the guards that the detainee recently stopped breathing, and a guard trained in CPR entered the cell and shook the detainee but made no attempt to perform CPR.  *Id.* Roughly seven minutes later, paramedics arrived and took the detainee to the hospital, where he died.  *Id.*  On appeal, the Eighth Circuit affirmed the lower court's denial of qualified immunity, holding that in the absence of any explanation, a reasonable jury could find the trained guard who did not perform CPR to have been deliberately indifferent.  *Id.* at 983-84.

This case presents an important distinction from the facts of *Tlamka* and *McRaven*.  In those cases, the record indicated that an inmate had very recently stopped breathing or was otherwise in need of and benefitting from CPR.  The guards in those cases knew as much and still refused to perform live-saving measures.  In this case, the undisputed facts show that, based on the information available to them at the time, Defendants believed that Mr. White had committed suicide, and thus life-saving measures would have been futile.

The summary judgment record shows that before Defendants arrived at Mr. White's cell, other inmates told them that Mr. White "was dead."  (ECF No. 37-5, p. 4).  Defendants went to Mr. White's cell and found that he was unresponsive, was not breathing or moving, and had an unnatural skin color.  Defendant Karimou examined Mr. White and informed the other guards that Mr. White appeared to be dead.  Nurse Thomas testified that this was a reasonable assumption for

laypeople like Defendants to make.  It is undisputed that Defendants did not attempt CPR because they believed Mr. White was dead.  Instead, Defendant Cohen radioed for medical staff and the guards concentrated on securing the scene and disbursing the gathered crowd of inmates.  Other evidence in the record—specifically, Dr. Kokes' expert report opining that CPR would not have helped Mr. White—also supports Defendants' assumption.

Plaintiff has not offered any evidence to controvert these facts.  At most, she points to Defendants' depositions, where they each agreed that the situation that night was a serious medical emergency.  However, that testimony does not establish that they were aware that there was a chance to resuscitate Mr. White and nonetheless chose not to act.  *See Gregoire*, 236 F.3d at 417 (requiring proof that defendants knew of a risk to the inmate's health and deliberately disregarded it, measuring their "actions in light of the information . . . possessed at the time, the practical limitations of [their] position and alternative courses of action that would have been apparent to an official in that position").  The subjective component of deliberate indifference cannot be met without such a showing.  Thus, no reasonable jury could find that Defendants "actually drew the inference that [Mr. White's] life was still at risk and consciously disregarded it."  *Robinson v. Riley*, No. CV 0:19-826-PJG, 2021 WL 6052616, at *11 (D.S.C. Dec. 21, 2021).

Nor has Plaintiff offered any evidence that Mr. White was alive at the time he was found, or that CPR or other resuscitative efforts could have saved him.  Thus, she has not established a genuine dispute of material fact as to whether Mr. White was beyond the point of resuscitation when he was discovered.  *See Reed v. Woodruff Cnty., Ark.*, 7 F.3d 808, 811 (8th Cir. 1993) (affirming dismissal of a deliberate indifference claim against a guard who did not perform CPR on an inmate who died from hanging when there was no evidence that CPR could or would have revived the inmate); *see also Grafton v. Bailey*, No. CV 13-2940, 2018 WL 2325410, at *11 (W.D.

15

La. May 22, 2018) (granting qualified immunity on a deliberate indifference claim against a prison guard who did not perform CPR on an unconscious inmate who later died, and finding no evidence showing that CPR would have helped the inmate or that the lack of CPR caused or contributed to the inmate's death). In the absence of evidence on this issue, any jury verdict in Plaintiff's favor would be based purely on speculation as to when Mr. White died and whether life-saving measures could or would have been effective.

Consequently, there is no basis upon which a reasonable jury could find that Defendants were deliberately indifferent to Mr. White's serious medical needs. The facts of this case are undoubtedly tragic. Mr. White's surviving family members understandably want to believe that if Defendants had attempted to administer aid, their loved one could still be alive. It can be argued that everything that could have been done to determine whether Mr. White had a chance of survival was not done. However, although the record reflects that Defendants' conduct may have arguably been negligent, it does not amount to deliberate indifference under governing caselaw. Plaintiff has not shown that Defendants violated Mr. White's Eighth Amendment rights, so they are entitled to qualified immunity.

### 2. Clearly Established Right

The above finding could end the Court's qualified-immunity analysis. *See Kulkay*, 847 F.3d at 642. But if the Court assumes *arguendo* that Defendants violated Mr. White's constitutional rights, the next question becomes whether the implicated right was clearly established at the time of the deprivation. *Jones*, 675 F.3d at 1161. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted).

Defendants raise qualified immunity at the summary judgment stage, so Plaintiff must produce evidence to create a genuine issue of fact regarding whether Defendants violated "clearly established" law. *Johnson v. Fankell*, 520 U.S. 911, 915 (1997). The Court must consider the information upon which the officials acted, but this does not mean a review of the officials' subjective intent. *Coffman v. Trickey*, 884 F.2d 1057, 1063 (8th Cir. 1989). Rather, the Court must measure the objective reasonableness of Defendants' conduct by reference to clearly established law, as "[n]o other circumstances are relevant to the issue of qualified immunity." *Davis v. Scherer*, 468 U.S. 183, 191 (1984) (internal quotation marks omitted).

 "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "there does not have to be a previous case with exactly the same factual issues." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009). But the implicated right cannot be defined "at a high level of generality." *Ashcroft*, 563 U.S. at 742.

The Court must ask whether the law, at the time of the events in question, gave Defendants "fair warning" that their specific conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Bills v. Dahm*, 32 F.3d 333, 334 (8th Cir. 1994) ("[T]o be clearly established, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). To show this, Plaintiff must identify "either controlling authority or a robust consensus of cases of persuasive authority that placed the statutory or constitutional question beyond debate at the time of the alleged violation." *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019) (en banc) (internal quotation marks omitted). The inquiry "must be

undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks omitted).

Plaintiff argues that the Eighth Circuit's opinions in *McRaven* and *Tlamka* established by no later than 2009 that a prison official commits deliberate indifference if he is trained to give CPR but refuses to perform it on a prisoner manifestly in need of it. Defendants argue that this case is distinguishable from *McRaven* and *Tlamka*, and thus there is no clearly established law prohibiting Defendants' conduct.

The Court agrees with Defendants. As discussed in the previous section, the Eighth Circuit clearly established in *McRaven* and *Tlamka* that when a guard is trained in CPR and is aware that an inmate is manifestly in need of CPR, the guard cannot refuse to help. Other federal circuit courts have held similarly. *See Lemire v. Cal. Dept. of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013); *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008); *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). In all those cases, there was some indication in the record that the inmate had very recently stopped breathing or was otherwise in need of urgent CPR, but the defendant guards ignored that and chose not to perform life-saving measures.

However, this case differs from those cases. It is undisputed that, based on the information available to them at the time, Defendants believed that Mr. White was dead. Thus, they did not provide CPR because they did not think it would help him. Plaintiff cites no cases involving that set of circumstances.

This is a critical distinction, as federal courts around the country have recognized. Many courts have held that when a guard reasonably believes that an inmate is dead, it is not deliberate indifference if the guard does not attempt CPR. *See, e.g.*, *Hearst v. Mason*, No. 1:11-cv-304, 2014

18

WL 1203269, at *6-8 (W.D. Pa. Mar. 24, 2014) (collecting cases).  For example, the Eighth Circuit

held that a deliberate indifference claim should be dismissed against a guard who did not provide

CPR to an inmate who hanged himself when the guard's observations led him to believe the inmate

was dead, and no evidence existed to the contrary.  *See Reed*, 7 F.3d at 811.  The Fifth Circuit

ruled the same in a factually similar case, explaining:

> [T]he deputies saw Smith lying on the floor in his cell; three different people felt
> for a pulse, found none and assumed Smith was dead; they neither removed the
> shoestring noose from Smith's neck nor attempted to resuscitate him; they took
> pictures of Smith's body and the scene of the suicide; and twenty minutes elapsed
> before the ambulance crew arrived, removed the noose from Smith's neck, and
> began life-saving techniques.  While the deputies' conclusion that Smith was
> already dead and their resulting failure to make any attempt to save Smith's life are
> arguably negligent, negligent conduct alone does not amount to deliberate
> indifference.

*Brumfield v. Hollins*, 551 F.3d 322, 333 (5th Cir. 2008).  In an unpublished opinion, the Fourth

Circuit also concluded that guards were not deliberately indifferent for not providing CPR to an

inmate who hanged himself, holding:

> Based on the absence of pulse and respiration, in combination with [the inmate's]
> appearance and the temperature of his body, [defendants] believed that [the inmate]
> was dead . . . Because the officers believed that [the inmate] was dead, their failure
> to attempt to resuscitate him was at most negligent.

*Ward v. Holmes*, 28 F.3d 1212, at *7 (4th Cir. 1994) (unpublished).

Multiple federal district courts have reached the same conclusion, finding no deliberate

indifference when prison guards, based on their observations and information available to them,

believed that an inmate hanged himself and was dead, and thus, did not attempt CPR.  *See Hearst*,

2014 WL 1203269, at *6-8; *Monzon v. Parmer Cnty., Tex.*, No. 2:06-cv-39-J, 2007 WL 1732384,

at *6 (N.D. Tex. June 15, 2007); *Clinton v. Cnty. of York*, 893 F. Supp. 581, 586-87 (D.S.C. 1995);

*see also Robinson*, 2021 WL 6052616, at *11 (finding no deliberate indifference when guards did

not perform CPR on inmates who had been attacked because the guards believed the inmates were dead).

These cases are highly instructive, both for the Court's earlier finding that Defendants were not deliberately indifferent to Mr. White's serious medical needs, as well as for calling into doubt whether Mr. White's implicated right was clearly established at the time. As the Court detailed earlier, Defendants arrived at Mr. White's cell after being told by inmates that he tried to hang himself and was dead. They observed Mr. White as unresponsive and lacking any signs of life, like breathing or movement. His skin was an unnatural color. Based on those observations, they thought he was dead and did not provide aid.

Plaintiff has pointed to no authority involving similar circumstances to create a genuine dispute of material fact as to the objective reasonableness of Defendants' actions under the law at the time. After careful consideration, the Court finds that Plaintiff has not satisfied her burden of showing controlling authority or a robust selection of persuasive caselaw that gave Defendants fair warning that their conduct was unconstitutional on March 10, 2019. *See Hope*, 536 U.S. at 741. Accordingly, Defendants are entitled to qualified immunity.

### 3. Conclusion

When viewed in the light most favorable to Plaintiff, the record does not establish that Defendants violated Mr. White's constitutional rights or that the implicated rights were clearly established at the time. Consequently, Defendants are entitled to qualified immunity. Plaintiff's section 1983 claims against them in their individual capacities will be dismissed with prejudice.

### C. State-Law Claims

Once Plaintiff's section 1983 claims are dismissed, the only remaining claims will be the ACRA claims. The Court may decline to exercise supplemental jurisdiction over state claims if it

"has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In other words, the Court maintains discretion to either dismiss or remand the state claims, or keep them in federal court.  *Lindsey v. Dillard's, Inc.*, 306 F.3d 596, 599 (8th Cir. 2002).  When determining whether to exercise supplemental jurisdiction, the Court considers factors such as judicial economy, convenience, fairness, and comity.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988); *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1249 (8th Cir. 2006) (per curiam).

The Eighth Circuit prefers the Court to decline to exercise supplemental jurisdiction when all federal claims have been eliminated before trial.  *See Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 819 (8th Cir. 2004) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.").  This preference aims to avoid encroachment on a state court's jurisdiction over matters of state law.  *See Curtis v. Sears, Roebuck & Co.*, 754 F.2d 781, 786-87 (8th Cir. 1985) (explaining that exercising jurisdiction over purely state-law claims is disfavored and noting that "if the federal court goes ahead and tries the state-law claim, it will conduct a full-blown trial and enter judgment on a claim over which it could not constitutionally have been given independent jurisdiction").  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Gregoire* 236 F.3d at 420 ("We stress the need to exercise judicial restraint and avoid state law issues wherever possible").

Under these circumstances, it would be inappropriate to exercise supplemental jurisdiction over the remaining state-law claims.  *See Curtis*, 754 F.2d at 785 (stating that exercising

supplemental jurisdiction is likely improper when dealing with state-law claims that could have been asserted on their own without raising any theory of recovery under federal law).  Plaintiff's state-law claims will be dismissed without prejudice.[5]

## IV.  CONCLUSION

For the above-stated reasons, the Court finds that Defendants' Motion for Summary Judgment (ECF No. 37) should be and hereby is **GRANTED**.  Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**.  Plaintiff's state-law claims are **DISMISSED WITHOUT PREJUDICE**.  A judgment of even date shall issue.

**IT IS SO ORDERED**, this 29th day of March, 2022.

/s/ Susan O. Hickey
Susan O. Hickey
Chief United States District Judge

---

[5] If "[Plaintiff chooses] to refile [her state-law] claims in state court, it appears that the Arkansas 'savings statute' protects [her] from any statute of limitations issue." *Sitzes v. City of W. Memphis, Ark.*, No. 3:08-cv-0026-WRW, 2009 WL 9072639, at *4 n.34 (E.D. Ark. Apr. 10, 2009) (citing Ark. Code Ann. § 16-56-126; *Carton v. Mo. Pac. R.R. Co.*, 295 Ark. 126 (1988), *aff'd*, 606 F.3d 461 (8th Cir. 2010)).